# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JODY TALLBEAR,<br><br>*Plaintiff*,<br><br>v.<br><br>JAMES RICHARD PERRY, Secretary, U.S. Department of Energy,<br><br>*Defendant*. | Civil Action No. 17-0025 (DLF) |

## MEMORANDUM OPINION

Jody TallBear brings this action against her employer, the U.S. Department of Energy, alleging that it racially discriminated against her by allowing other employees to discuss the Washington Redskins football team and display Redskins paraphernalia at work. She also alleges that the Department of Energy retaliated against her after she raised concerns about the Redskins following in the office. Before the Court is Energy Secretary James Richard Perry's Motion to Dismiss.[1] Dkt. 9. For the reasons that follow, the Court will grant the motion in part and deny it in part.

## I. BACKGROUND

The Department of Energy (DOE) hired TallBear in 2011 as an attorney advisor in the Office of Economic Impact and Diversity. Compl. ¶ 8, Dkt. 1. TallBear "has held herself out to be Native American," *id.* ¶ 1, and for several years served as lead for tribal and Native American

---

[1] Ernest Moniz was Energy Secretary when TallBear filed her complaint, but Perry has since taken that position and is automatically substituted as the defendant in this case under Rule 25(d) of the Federal Rules of Civil Procedure.

engagement in DOE's Economic Impact and Diversity office, *id.* ¶ 9. In 2013, TallBear became the Strategic Initiatives and Policy Advisor for the Economic Impact and Diversity office. *Id.* ¶ 12. In that role, TallBear gave numerous presentations on issues of race and bias, such as "What can a critical look at Indian mascots teach us about uncovering bias in ourselves and others?" *Id.* ¶¶ 14–15.

The crux of the discrimination claim is TallBear's allegation that she has been "repeatedly exposed" to the Washington Redskins name and logo, from "posters placed in common areas by DOE employees" to "clothing worn by employees" and "causal and widespread use" of the term in her presence. *Id.* ¶ 20. TallBear also cites two specific instances of exposure to the Redskins. First, a DOE leadership trainer wore a Redskins tie and mentioned the Redskins during a presentation in February 2012. *Id.* ¶ 21. Second, a DOE attorney left a "Redskins Special" flyer from Subway—the sandwich shop—on Tallbear's desk in December 2012. *Id.* ¶ 22. TallBear also alleges that Native Americans are not included in diversity training though other groups are and that DOE has not offered "cultural sensitivity training" on Native American issues. *Id.* ¶ 23. All this, TallBear says, despite the fact that she has "communicated multiple times to DOE leadership that she is deeply offended by the [Redskins] term and its widespread use in the DOE workplace." *Id.* ¶ 18. TallBear considers the term a racial slur, in part because it was "widely used throughout the 18th and 19th centuries to denote the physical proof of kill of a Native American in order for hunters to collect the monetary bounty." *Id*.

In March 2013, TallBear expressed her concerns in a memorandum to her boss, Director of Economic Impact and Diversity LaDoris Harris, and two DOE Deputy Directors. *Id.* ¶ 25. TallBear asserted that DOE was fostering a hostile work environment that caused her anxiety and

depression. *Id.* In June 2013, DOE's Office of General Counsel informed DOE's Office of Diversity and Inclusion that it had found no legal basis to ban Redskins paraphernalia and did not advise providing sensitivity training on the issues TallBear raised. *Id.* ¶ 28. The Office of General Counsel also suggested that TallBear could direct her concerns to the U.S. Office of Personnel Management (OPM) or the U.S. Equal Employment Opportunity Commission (EEOC). *Id.* TallBear accordingly sent a memorandum to those agencies in October 2013, but received no response. *Id.* ¶ 29. TallBear wrote additional memoranda to OPM in June 2014 and to the U.S. Commission on Civil Rights in November 2014. *Id.* ¶¶ 30–31. In December 2014, the OPM Director of Diversity and Inclusion responded that there was "no legal basis for banning [Redskins] paraphernalia." *Id.* ¶ 32.

In October 2015, TallBear informed Harris that she had accepted several invitations to speak at other federal agencies on issues of race and bias during Native American Heritage Month events. *Id.* ¶ 35. TallBear had spoken at similar events in the past two years and had given a presentation on sensitivity training at a meeting of agency diversity leaders the previous month. *Id.* ¶¶ 33, 35. Harris responded negatively, stating that she did not want her "role as Director [in] jeopardy because you went off speaking regarding controversial issues." *Id.* ¶ 36. The same month, Harris postponed TallBear's attendance at a federal training program that was scheduled for January 2016. *Id.* ¶ 37. As of the complaint's filing in January 2017, that training had not been rescheduled. *Id.* ¶ 38. Also in October 2015, Harris allegedly began to "remov[e] Ms. TallBear from her policy lead position" and "exclude Ms. TallBear from meetings, briefings with senior leadership or other offices, and similar assignments that she had handled for the last several years." *Id.* ¶ 39. TallBear also alleges that the ten to fifteen trips per year she normally took for speaking engagements or stakeholder engagement was reduced to zero. *Id.* ¶ 40.

3

TallBear was also asked by a member of the Office of General Counsel to "take personal leave and disassociate herself from DOE" when speaking at planned engagements for Native American Heritage Month because TallBear planned to make presentations "showing other ethnic groups as mascots" and that could "open the agency up to litigation." *Id.* ¶ 41 (some quotation marks omitted). TallBear alleges that in November 2015, Harris reassigned many of her responsibilities to a less experienced staff member. *Id.* ¶ 42.

On December 7, 2015, TallBear was reassigned to DOE's Office of Civil Rights to process Title VII complaints. *Id.* ¶ 43. TallBear calls this a "de facto demotion." *Id.* TallBear says that she has sought detail opportunities in energy-policy offices since then but that Harris or the Office of General Counsel rejected those requests. *Id.* ¶ 44. TallBear also alleges that in February 2016, Harris did not include her in a meeting to discuss a report of Harris's accomplishments at DOE, and in March 2016, a request to attend a DOE meeting with the Montana Governor's office was denied. *Id.* ¶¶ 45, 46.

TallBear filed an informal complaint on December 10, 2015 and a formal administrative complaint in March 2016. *Id.* ¶ 5. The FBI issued a Report of Investigation in September 2016.[2] *Id.* ¶ 6. On January 5, 2017, more than 180 days after TallBear filed her administrative complaint, she filed suit in this Court. *See* Compl. The case was reassigned to the undersigned judge on December 4, 2017.

## II. LEGAL STANDARDS

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed. R.

---

[2] TallBear's complaint was forwarded to the FBI for investigation because the responsible management officer was the Director of DOE's Office of Civil Rights, which typically handles discrimination complaints against the agency. Compl. ¶ 5.

4

Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 557 ("Factual allegations must be enough to raise a right to relief above the speculative level."). A complaint need not contain "detailed factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). The assumption of truth does not apply, however, to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quotation marks omitted). An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Ultimately, "[d]etermining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When deciding a Rule 12(b)(6) motion, the court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624

(D.C. Cir. 1997). A Rule 12(b)(6) dismissal "is a resolution on the merits and is ordinarily prejudicial." *Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992).

## III. ANALYSIS

### A. Discrimination Claim

Title VII of the Civil Rights Act of 1964 provides that "[a]ll personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race . . . or national origin." 42 U.S.C. § 2000e-16(a). Here, TallBear alleges that DOE subjected her to "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (internal quotation marks omitted).

An employee can prove unlawful discrimination with either direct or indirect evidence. An employee has direct evidence of unlawful discrimination if, for example, the employer "overtly refer[s]" to the employee's protected trait when making an unfavorable employment decision. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 272 (1989) (O'Connor, J., concurring in the judgment). The indirect method of proof, on the other hand, requires the employee to establish a prima facie showing of discrimination, which can then be rebutted by the employer. The elements of a prima facie case of discrimination are: (1) the plaintiff is part of a protected class; (2) the plaintiff suffered a cognizable adverse employment action; and (3) the action gives rise to an inference of discrimination. *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015).

But proof is unnecessary at this stage, of course, because "the ordinary rules for assessing the sufficiency of a complaint apply" to a Title VII motion to dismiss. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (U.S. 2002); *see also Gordon v. U.S. Capitol Police*, 778 F.3d 158, 161–

162 (D.C. Cir. 2015) (observing that "*Twombly* . . . reaffirmed *Swierkiewicz*" and writing that a plaintiff "need not plead facts showing each of [the prima facie] elements in order to defeat a motion under Rule 12(b)(6)"). The ordinary rules require TallBear to plead facts with enough specificity to allow the Court, taking these factual allegations as true, to draw a reasonable inference that she faced "discrimination based on race." 42 U.S.C. § 2000e-16(a); *see also Iqbal*, 556 U.S. at 678.

TallBear's charge of discrimination—that she was present when the Redskins name was repeatedly referred to and when Redskins symbols were visible in the workplace, Compl. ¶ 49—does not meet that bar. The Court accepts at face value TallBear's claim that the use of the Redskins name is deeply hurtful to her. *See id.* ¶ 18 n.1 (asserting that "[t]he term (Redskins) originates from a time when Native people were actively hunted and killed for bounties, and their skins were used as proof of Indian kill" and more recently has been used "to disparage and denote inferiority and savagery"). Indeed, the question whether "Redskins" and similar team nicknames are offensive racial slurs is a matter of current public controversy. *See Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2262 (2015) (Alito, J., dissenting) (observing that the Redskins name is controversial). However, Title VII does not require the country's employers to stand aggressively on one side of that public debate by banning employees from referring to their local professional football team by name in the workplace.

It would be different had TallBear's supervisors or coworkers directed their use of the Redskins term at TallBear in a derisive manner. For example, had DOE employees disparagingly called TallBear a "Redskin" with enough regularity to create "an environment that a reasonable person would find hostile or abusive," TallBear could have a Title VII claim. *See*

*Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). *But see Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986) (The "mere utterance of an ethnic or racial epithet [that] engenders offensive feelings in an employee [does] not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." (internal quotation marks omitted)); *see also Park v. Howard Univ.*, 71 F.3d 904, 906 (D.C. Cir. 2005) ("[C]asual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action." (quotation marks omitted)).

In this case, however, TallBear's coworkers repeatedly used the word Redskins to refer to their local professional football team. A reasonable person, hearing employees' chatter about the "Redskins" in relation to football, would not conclude not that the employees were using the term as a racial slur. Likewise, a reasonable person observing a coworker's Redskins necktie would conclude not that the coworker meant to disparage anyone but that the coworker wished to express support for the football team. And finally, a reasonable person would not conclude that the one-time placement on TallBear's desk of a fast-food flyer advertising the Redskins was motivated by discriminatory ridicule.

Although the use of the Redskins term offends some, for now at least it continues to be commonly used in our society as a football team name. *See, e.g.*, *Sons of Confederate Veterans*, 135 S. Ct. at 2262 (Alito, J., dissenting) (observing that Virginia issues specialty license plates expressing support for the "Redskins" football team); *Pro Football, Inc. v. Harjo*, 565 F.3d 880, 881 (D.C. Cir. 2009) (using the term "Redskins" to reference the football team). Because the

complaint indicates that TallBear's coworkers used the Redskins term and logo not as a slur but in reference to the football team, her claim must be dismissed.[3]

## B.    Retaliation Claim

Title VII's antiretaliation provision prohibits an "employer" from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII]" or because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). The D.C. Circuit applies the antiretaliation provision against the federal government.[4]  *See, e.g.*, *Johnson*, 798 F.3d at 1091. To prove a retaliation claim, an employee "must show (1) that [the] employee engaged in statutorily protected activity; (2) that the employee suffered a materially adverse action by the employee's employer; and (3) that a causal link connects the two." *Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of Library of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013). "To survive [a] motion

---

[3] TallBear cites as additional bases for a finding of discrimination that (1) she communicated to DOE multiple times that the Redskins term offends her and (2) DOE did not institute sensitivity training on the issues TallBear raised. *See* Compl. ¶¶ 18, 23; TallBear Opp'n at 11–12, Dkt. 12. These citations do not help TallBear because an employer need not conform to an employee's expressed position or offer sensitivity training in order to comply with Title VII. *See Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015) (stating that a claim for failure to remediate is "not actionable unless the underlying incident would itself be actionable").

[4] The Supreme Court has observed that "Title VII's federal-sector provision . . . does not incorporate the provision prohibiting retaliation," *Gomez-Perez v. Potter*, 553 U.S. 474, 487–88 (2008), but the Court has never directly addressed the question whether Title VII's antiretaliation provision applies against the federal government, *id.* at 488 n.4 (declining to address the question whether Title VII bans retaliation in federal employment). In a later case that concerned the antiretaliation provision's standard of causation, however, the Court concluded that when Title VII "text . . . says nothing about retaliation claims, . . . it would be improper to conclude that what Congress omitted from the statute is nevertheless within its scope." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013).

to dismiss, [a] complaint must contain sufficient factual matter, accepted as true, to plausibly establish those three elements." *Id.* (internal quotation marks omitted).

TallBear's complaint fails to do that. The complaint asserts that TallBear engaged in several statutorily protected activities:

- *Presentations*: Throughout her employment, TallBear "gave many presentations at DOE and other federal agencies concerning 'topics on stereotypes, bias, and racism related to Native Americans,' which often included a discussion of the discriminatory use and depiction of controversial Indian Mascots," TallBear Opp'n at 30, Dkt. 12 (quoting Compl. ¶ 14);
- *2013 communications with Harris*: In March and May 2013, TallBear expressed to Harris her belief that exposure to the Redskins name and logo created a hostile work environment, Compl. ¶¶ 25–27;
- *Communications with other agency leaders*: In 2014 and February 2015, TallBear wrote to and met with leaders of other agencies about her concerns, *id*. ¶¶ 29–33;
- *Notification to Harris*: In October 2015, TallBear notified Harris that she had accepted speaking engagements at other agencies in which she planned to "discuss the challenges to achieving Native American inclusion in the federal workplace and would discuss the stereotypical depictions of Native Americans in mainstream culture including sports team's mascots," Compl. ¶ 35;
- *Complaints*: TallBear filed an informal complaint on December 10, 2015 and a formal administrative complaint on March 2, 2016, *id*. ¶ 5.

First, TallBear's presentations at DOE and other agencies are not statutorily protected activity. During these presentations TallBear did not "oppose any discrete practice" or suggest that DOE unlawfully discriminated against her or others. *Morris v. McCarthy*, 825 F.3d 658, 673 (D.C. Cir. 2016); *see also Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) ("[O]pposition to an illegal employment practice must identify the employer and the practice."); *Morris*, 825 F.3d at 673 (citing *Curay-Cramer*). Rather, as a member of DOE's Economic Impact and Diversity office, TallBear took positions on a race-related controversy, giving talks that were more akin to "job-related policy discussions," *Morris*, 825 F.3d at 673, than opposition to a particular DOE policy. *See id.* (stating that the expression of a "generalized policy [position]" is not statutorily protected and that a contrary conclusion

10

"would risk insulating employees in civil rights roles from adverse employment action, because such debates are presumably part of their everyday duties").

For the same reason, TallBear's notification to Harris in October 2015 that TallBear had accepted engagements at other agencies during which she planned to speak about issues of race and show other ethnic groups as mascots is not statutorily protected activity. TallBear did not at that time inform Harris of any opposition to a discrete DOE practice or policy; TallBear suggested instead that she opposed a general cultural phenomenon. According to the complaint, TallBear told Harris that she planned to speak generally about the challenges of achieving "Native American inclusion in the federal workplace" and about "stereotypical depictions of Native American […] mascots." Compl. ¶ 35.

Next, while DOE concedes that TallBear's communications to Harris in 2013 was statutorily protected, the complaint fails to allege a causal link between those communications—or the communications to other agency leaders in 2014 and February 2015—and an adverse action. The only possible causal inference that might be drawn from the complaint is one from temporal proximity. *See Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (writing that an employee may establish causality by showing that "the employer had knowledge of the employee's protected activity, and the adverse personnel action took place shortly after that activity" (quotation marks and alteration omitted)); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 31 (D.D.C. 2010) ("Because causation is often the most difficult element to show in advance of discovery, courts generally rely on the length of time between the protected activity and the adverse action to determine whether causation has been sufficiently pled at the motion to dismiss stage."). The D.C. Circuit has not established a bright-line rule for what "shortly after" means, but the Circuit has emphasized that the protected activity and adverse action must be "very close

11

in time." *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (internal quotation marks omitted). The Supreme Court has suggested that three months is generally too long. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (approvingly citing cases finding three- and four-month intervals insufficiently close in time); *see also McIntyre v. Peters*, 460 F. Supp. 2d 125, 133 (D.D.C. 2006) (collecting cases for the proposition that D.D.C. judges have "often followed a three-month rule to establish causation on the basis of temporal proximity alone").

Here, the temporally closest purportedly protected communication occurred in February 2015, eight months—more than twice the normal outer boundary—before the first alleged adverse actions in October 2015 (the postponement of her training, removal from policy lead position, and exclusion from meetings and assignments). And the February 2015 activity did not involve DOE—it consisted of TallBear speaking spoke with the director of OPM. The complaint contains nothing to suggest that DOE even knew about the conversation other than that in June 2013 DOE suggested OPM would be an appropriate agency for TallBear to speak with. Compl. ¶ 28–33; *see also* TallBear Opp'n at 29–30. TallBear's initial conversations with Harris in 2013 happened more than two years before the first alleged adverse action. Therefore, none of these communications can form the basis for a temporal-proximity inference.

That leaves the administrative complaints that TallBear filed on December 10, 2015 and March 2, 2016. DOE concedes that these are statutorily protected activities but argues that they do not correspond to any materially adverse action. DOE Mem. at 24–25, 31–33, Dkt. 9. TallBear alleges that two kinds of adverse action occurred shortly after she filed her complaints. First, TallBear alleges that DOE thwarted several opportunities for her to detail (i.e., to work temporarily for other agencies). Compl. ¶ 44 ("Although multiple offices have offered to bring her in on detail at no charge to [Economic Impact and Diversity] between February 2016 and

July 2016, [Economic Impact and Diversity] Director Harris has either denied or directed others to deny the requests. Additionally, on February 19, 2016, the [DOE] Office of General Counsel – Litigation, intervened in one detail discussion and declined it."). Second, TallBear alleges that DOE excluded her from two meetings that fell within her job responsibilities. Compl. ¶ 45 ("[O]n February 26, 2016, Director Harris invited a total of 14 people, including new staff people lacking historical knowledge, to a meeting to discuss the creation of a report of all Director Harris' accomplishments since joining DOE and excluded Ms. TallBear who had led many of [Economic Impact and Diversity's] major initiatives since 2012."); *id.* ¶ 46 ("[O]n March 18, 2016, a request for Ms. TallBear to attend a DOE meeting with the Montana Governor's Office as a tribal expert was denied.").

That is enough to survive a motion to dismiss. In the retaliation context, a materially adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation omitted); *see also Baird v. Gotbaum*, 662 F.3d 1249 (D.C. Cir. 2011) ("In the retaliation context the adverse action concept has a broader meaning [than for discrimination claims]" and is "not limited to discriminatory actions that affect the terms and conditions of employment." (internal quotation marks omitted)). By the summary-judgment stage, therefore, TallBear must produce evidence that the meeting exclusions and detail rejections caused her "significant . . . harm" sufficient to create that level of deterrence. *White,* 548 U.S. at 68; *see also Allen v. Napolitano*, 943 F. Supp. 2d 40, 45–46 (D.D.C. 2013) ("The Court declined to dismiss this claim before discovery because [the plaintiff] could have developed evidence that the non-participation in certain meetings resulted in the requisite objectively tangible harm. Discovery, now completed, has revealed the contrary." (citation omitted)). A complaint,

however, need not specify the extent of the harm caused by the alleged adverse action. *See Iqbal*, 556 U.S. at 678 ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations." (internal quotation marks omitted)). TallBear pleaded what, when, and who with specificity, and that is enough to survive a motion to dismiss.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Perry's Motion to Dismiss. Dkt. 9. The motion is denied only with respect to TallBear's assertion that DOE retaliated against her for filing administrative complaints by excluding her from meetings and thwarting detail opportunities. In all other respects, the motion is granted.

Accordingly, the discrimination claim is dismissed, and the retaliation claim survives only with respect to TallBear's assertion that DOE retaliated against her for filing administrative complaints by excluding her from meetings and thwarting detail opportunities.

A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

Date: July 24, 2018